UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMIE L. LEONARD,

                              Plaintiff,

v.                                                    7:15-CV-00125
                                                      (TJM/TWD)

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

APPEARANCES:                          OF COUNSEL:

CONBOY, McKAY, BACHMAN &              LAWRENCE D. HASSELER, ESQ.
  KENDALL, LLP
*Counsel for Plaintiff*
407 Sherman Street
Watertown, New York 13601


HON. RICHARD S. HARTUNIAN            EMILY M. FISCHMAN, ESQ.
United States Attorney for the       Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207


OFFICE OF GENERAL COUNSEL            STEPHEN P. CONTE, ESQ.
Social Security Administration       Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278



**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>REPORT AND RECOMMENDATION</u>**

This matter was referred to the undersigned for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Both parties have filed briefs. Oral argument was not heard. For the reasons discussed below, it is recommended that this matter be remanded to the Commissioner for further proceedings consistent with the findings set forth below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Jamie Leonard ("Leonard") is 30 years old, with a birth date of November 7, 1985. (Administrative Transcript 143.[1]) She attended special classes in high school and obtained an Individual Education Plan ("IEP") diploma. (T. at 53.) In the past, she has worked as cashier in a dining facility, a prep cook, in housekeeping at a hotel, and as a greeter in a store. (T. at 53-56.) Plaintiff alleges disability due to post traumatic stress disorder ("PTSD"), attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD"), learning disability, asthma, depression, and anxiety. (T. at 57-59, 72.)

Plaintiff applied for Title II disability insurance benefits on March 23, 2011.[2] (T. at 87, 143.) The application was initially denied on June 3, 2011. (T. at 92-95.) Plaintiff filed an untimely request for a hearing before an Administrative Law Judge ("ALJ") with a "good cause" explanation on August 23, 2011. (T. at 96-97.) The ALJ denied the request, and the Appeals Council vacated her

---

[1] The Administrative Transcript is found at Dkt. No. 10. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

[2] In her Brief, Plaintiff has incorrectly identified her claim as one for Supplemental Security Income. (Dkt. No. 13.)

determination on September 12, 2012.  (T. at 89.)  A video hearing was held on June 26, 2013.  (T. at 48-71.)  On September 12, 2013, the ALJ issued a decision finding that Plaintiff was not disabled.  (T. at 31.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on January 20, 2015.  (T. at 1.)  Plaintiff timely commenced this action on February 3, 2015.  (Dkt. No. 1.)

## II.    APPLICABLE LAW

### A.    Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits must establish that she or he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability.  20 C.F.R. § 404.1520(a)(4) (2015).  Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful

activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g);

*Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "An ALJ must set forth the crucial factors

justifying his findings with sufficient specificity to allow a court to determine whether substantial

evidence supports the decision." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010);[3] *see*

*Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "Substantial evidence has been defined as

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'"

*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be

'more than a mere scintilla' of evidence scattered throughout the administrative record. *Featherly*,

793 F. Supp. 2d at 630 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a

reviewing court considers the whole record, examining the evidence from both sides, because an

analysis of the substantiality of the evidence must also include that which detracts from its weight."

*Williams*, 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its

interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir.

1982).

## III.    THE ALJ'S DECISION

The ALJ found that Plaintiff met the disability insured status requirements of the Social

---

[3] On Lexis, this published opinion is separated into two documents. The first is titled
*Roat v. Barnhart*, 717 F. Supp. 2d 241, 2010 U.S. Dist. LEXIS 55442 (N.D.N.Y. June 7, 2010).
It includes only the district judge's short decision adopting the magistrate judge's report and
recommendation. The second is titled *Roat v. Commissioner of Social Security*, 717 F. Supp. 2d
241, 2010 U.S. Dist. LEXIS 55322 (N.D.N.Y. May 17, 2010). It includes only the magistrate
judge's report and recommendation. Westlaw includes both the district court judge's decision
and the magistrate judge's report and recommendation in one document, titled *Roat v. Barnhart*,
717 F. Supp. 2d 241 (N.D.N.Y. 2010). The Court has used the title listed by Westlaw.

Security Act through June 30, 2015. (T. at 31.) She found Plaintiff had not engaged in substantial gainful activity since February 6, 2011, the alleged onset date of disability. *Id*. The ALJ determined that the claimant had the following "severe" impairments: intellectual disability, depression, anxiety disorder, and PTSD. *Id.* The ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (T. at 34.) The ALJ determined that claimant had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, and mentally, she was capable of unskilled work involving routine daily tasks that do not significantly change in pace or location on a daily basis. (T. at 35.) The ALJ found that no past work had been sustained long enough and been performed at levels of substantial gainful activity to constitute past relevant work. (T. at 38.) Considering claimant's age, education, work experience, and RFC, the ALJ determined that the claimant was not disabled as there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.*

IV.     **THE PARTIES' CONTENTIONS**

Plaintiff claims the Commissioner erred in: (1) failing to properly assess the severity of her asthma; (2) failing to find that she suffers from a listing-level intellectual deficit; (3) failing to follow the required steps in considering her mental disorder; and (4) failing to properly analyze her credibility. (Dkt. No. 13 at 2, 7, 9, 13, 16 [4].) In addition, Plaintiff claims there is no substantial evidence to support the Commissioner's conclusion that there is significant work in the national economy that she could perform. *Id*. at 2, 18.

The Commissioner contends the ALJ's decision applied the correct legal standards and is

---

[4] Citations to the parties' Briefs (Dkt. Nos. 13 and 14) are to the page number assigned by the Court's CM/ECF system.

supported by substantial evidence and thus should be affirmed.  (Dkt. No. 14.)

## V.    EVIDENCE

### A.    School Psychologist Records

1.    <u>Kindergarten Psychological Evaluation</u>

Plaintiff was referred to Peter Dawson ("Dawson"), School Psychologist in the South Lewis

Central School District, for a psychological evaluation after she had been retained in kindergarten and

was still not developing the readiness skills usually acquired by kindergarten students.[5]  (T. at 226.)

Plaintiff's "receptive language skills appear[ed] to be low, [she] appear[ed] to be unduly impulsive,

panicky when frustrated, she appeared to have a short attention span, and the question of either her

being developmentally delayed or learning disabled was raised."  *Id*.

Plaintiff presented herself to Dawson as a "friendly and cooperative young lady, who

attempted to do what was expected of her in the testing situation."  (T. at 228.)  Test results indicated

that Plaintiff was not developmentally ready to do pre-reading tasks typical of kindergarten students

and future evaluations would be needed to help determine whether Plaintiff was simply

developmentally immature in this area or there was a perceptual delay and/or neurological component

to her learning difficulties.  (T. at 227.)   Testing also revealed that Plaintiff's cognitive ability or

aptitude was in the lower range of average.  (T. at 228.)  Dawson was left with the impression that a

learning disability and/or neurological factors might be an issue.  *Id*.  Repeated classroom

observations of Plaintiff by Dawson revealed that she appeared to be in a fugue state, had a hard time

attending to things in groups, and either she did not understand what was going on or had a hard time

---

[5]  The evaluation began on October 25, 1991, and was completed on January 24, 1992.
(T. at 226.)

with focus and concentration.  (T. at 228.)  Dawson suspected Plaintiff might be suffering from some type of attention deficit disorder.  *Id*.

### 2.  October 13, 1995, Psychological Evaluation

Dawson did a second psychological evaluation of Plaintiff when she was nearly ten years old. (T. at 231.)  By that time, Plaintiff was in a 15:1 self-contained classroom.  *Id*.  Plaintiff was referred for re-evaluation due to a concern expressed by her mother over possible ADHD, and Plaintiff's teacher's observation that Plaintiff had a problem with focus and attention in class.  *Id.*

Plaintiff obtained a borderline normal rating on the delay tasks in Gordon Diagnostic System. (T. at 232.)   She was fidgety during the testing and spaced out, one time staring at the clock for at least 90 seconds.  *Id*.  On the vigilance task, Plaintiff scored in the abnormal range, and Dawson noted that she again spaced out for periods of time and seemed to have a real problem with focus and attention.  *Id*.

Dawson found anxiety in the form of psychosomatic behavior was pronounced in both settings on the Behavior Assessment System for Children Teacher Rating Scale and Parent Rating Scale, with overt anxiety behavior more pronounced in school, although not excessively so.  Dawson concluded that Plaintiff's adaptive behaviors were "borderline to normal suggesting that while she [did] have difficulties, she [was] adapting and adjusting relatively well."  *Id*.  Dawson's greatest areas of concern with Plaintiff were her fugue like "spacing out" and anxiety.  *Id*.

### 3.  Fifth Grade Psychological Evaluation

Dawson did a third psychological evaluation on Plaintiff when she was an eleven year old fifth grade student.  (T. at 233.)  Dawson administered a battery of tests to obtain additional information concerning Plaintiff's cognitive ability, academic achievement, visual-motor skills, and personality.

(T. at 233.)  Dawson described Plaintiff as coming willingly to the testing sessions and being excited at the prospect of participating in new activities.  (T. at 234.)  Plaintiff expressed a dislike for "special education" and wanted to take tests with her regular classmates (referring to her testing modifications).  *Id.*  Plaintiff was cooperative and friendly during the testing, attempted all tasks asked of her, appeared to be attentive and alert, and engaged in spontaneous verbalizations with Dawson on a number of subjects.  *Id.*

### a.  Wechsler Intelligence Scale for Children – Third Edition

On the Wechsler Intelligence Scale for Children – Third Edition ("WISC – III"), Plaintiff obtained a Verbal IQ of 66 (61-74 range, borderline/mentally handicapped), and Performance IQ of 86 (79-95 range, borderline/average) resulting in a Full Scale IQ of 74 (69-81 range, low average/mentally handicapped).  *Id.*  Dawson indicated that the significant difference in Plaintiff's Verbal and Performance IQ suggested that she expressed herself better through the manipulation of concrete nonverbal stimuli than through verbal expression.  *Id.*  Plaintiff's score on Similarities was a relative strength as compared to her other Verbal scores, indicating relatively good abstract verbal reasoning skills and ability to visually organize information without using motor activity.  (T. at 235.)  Dawson concluded that Plaintiff's performance on the WISC-II suggested that her ability to retain information over a long period of time was relatively weak, and that she probably was better able to retain information presented visually.  *Id.*

### b.  Kaufman Test of Educational Achievement

On the Kaufman Test of Educational Achievement ("KTEA"), Plaintiff obtained a Reading Composite score of 63 (57-69 range, lower extreme), and a Mathematics Composite score of 61 (57-65 range, lower extreme), resulting in a Battery Composite score of 61 (55-67 range, lower extreme).

(T. at 235.)  A comparison of Plaintiff's WISC-III and KTEA indicated a fifty percent discrepancy between her actual and expected achievement, which Dawson found suggested that Plaintiff might continue to be identified as learning disabled.  *Id.*

### c.      Bender-Gestalt Test for Children

Plaintiff obtained a Koppitz raw score of five, which correspondended to lower than the fifth percentile and demonstrated an age equivalency of 7-6 to 7-11.  (T. at 235.)  Plaintiff's performance suggested continued delay of her visual-motor integration skills.  *Id.*

### d.      Recommendations

Dawson recommended that Plaintiff move into the Option I class in middle school, continue to be identified as learning disabled, and continue to receive counseling services.  (T.  at 236.)  Dawson indicated that Plaintiff "may be mainstreamed where appropriate, however vocational, community-based employment, or life skills programs may need to be considered for the long term."  *Id.*

### 4.      Ninth Grade Psychological Report

South Lewis Central School District School Psychologist Leann Dunckel ("Dunckel") prepared a psychological report on Plaintiff when she was fifteen years old and in ninth grade.  (T. at 238.)  Plaintiff was referred to Dunckel because of a lack of progress in reading comprehension and lack of success in mainstreaming, specifically in Introduction to Occupations.  *Id.*  Plaintiff's special education teacher questioned whether a life skills based education would be more beneficial to Plaintiff.  *Id.*  Plaintiff's teacher reported that Plaintiff could decode words at a primary level but did not comprehend what she read, did not consistently count money, and had trouble following multiple directions.  (T. at 239.)  Plaintiff was described by her teacher as well behaved and kind to others.  *Id.*  Plaintiff's mainstream teachers described her as having difficulty mastering concepts and, as a result,

rarely turning in homework.  (T. at 239.)

Dunckel noted by way of background that Plaintiff's history was positive for asthma and anxiety, for which Plaintiff was being treated with Zoloft.  (T. at 238.)  Plaintiff's mother reported that Plaintiff had frequent stomach aches related to school and was exhausted when she came home from school, generally napping for one or two hours.  *Id*.  Plaintiff's mother also stated that Plaintiff could not read the materials to do her mainstream homework, and that she was worried about Plaintiff's ability to become independent in the future because of her academic difficulties.  *Id*. Plaintiff's mother was researching post-school training that included a life skills component.  *Id*.  She described Plaintiff as a fun child who enjoyed doing anything that had to do with outdoors or animals. *Id*.

> a.    WISC-III

Plaintiff obtained a Verbal Standard Score of 73, a Performance Standard Score of 75, and a Full Scale Standard Score of 72 on the WISC-III.  (T. at 239.)  Plaintiff's cognitive ability testing indicated that her overall cognitive abilities were in the borderline range.  (T. at 240.)  Plaintiff's personal strength was in her overall verbal comprehension, which had been a weakness in 2/97, and helped to increase her Verbal Standard Score.  *Id*.  Dunckel explained that scores in the borderline range are much lower than average, but slightly higher than the scores in mild mentally retarded range ("MR"), and that students in the MR range tend to have academic struggles similar to or worse than Plaintiff, but also have very weak adaptive skills, described by Dunckel as "things like self-care, understanding health and safety, social functioning, working, and skills required to maintain a home." *Id*.

Dunckel noted that Plaintiff's adaptive abilities had not been fully assessed because she was

functioning adequately in social school and home life.  (T. at 240.)  She suggested that if Plaintiff's parents had concerns about her adaptive abilities – ability to live independently as an adult – and wanted to pursue support for her as an adult, they might wish to have her adaptive abilities assessed "for the purpose of ruling an overall rate of lower academic and adaptive development (MR) out."  *Id.*

b.     Behavior Assessment System for Children - Self-Report

On the Behavior Assessment System for Children ("BASC"), Plaintiff reported feeling different from her peers and having many stresses and worries with significantly high levels of physical symptoms such as headaches and stomach aches.  (T. at 241.)  According to Dunckel, Plaintiff's BASC responses suggested she might react to her academic difficulties "by not trying because effort will not necessarily lead to success."  *Id.*  Dunckel noted that feeling high levels of constant stress and worry use up a lot of a person's energy, and she opined that Plaintiff was "certainly at risk for becoming or already feeling exhausted and depressed much of the time."  *Id.*  Dunckel indicated that Plaintiff was undergoing treatment for anxiety and did not feel equipped to be successful at what was currently expected of her.  *Id.*

c.     Conclusions and Recommendations

Dunckel found that obtaining an IEP diploma was a wonderful option for Plaintiff because it would "allow[ ] her the flexibility to focus on functional academics (the math and reading needed to cook, grocery shop, budget, and read basic materials like ads in the newspaper and menus)" while she would also be able to "pursue skill training for a future job (BOCES program, a work experience in the community)."  (T. at 241.)

Dunckel recommended, among other things, that Plaintiff's CSE continue with classification under a student with a learning disability in order to allow her to pursue the option of preparing for

life through an IEP diploma; and that her program be life skills based and a BOCES program and a community work experience be considered. (T. at 241-42.)

5        Twelfth Grade Psychological Evaluation

Dawson did a psychological evaluation of Plaintiff when she was eighteen years of age and in twelfth grade. (T. at 243.) Dawson's brief observation of Plaintiff in the classroom revealed her to be friendly and cooperative. (T. at 244.) Plaintiff told Dawson that she did not know what she wanted to do when she finished school except that she wanted a job. *Id.* Plaintiff spoke positively about her community based training programs, including the hospital, the P & C, Country Bob's, and the Farmer's Coop. *Id.*

Plaintiff's performance on the Bender Motor Gestalt Test suggested continued weakness in the area of visual perception motor integration skills, and her manner of completion of the test suggested that she was rather unsure of herself. *Id.* Plaintiff's performance on the Wechsler Adult Intelligence Scale III ("WAIS-III"), a Verbal IQ of 69, Performance IQ of 80, and Full Scale IQ of 72, continued to suggest low borderline cognitive ability. *Id.* Dawson noted that Plaintiff:

> did best in terms of understanding what is happening in social situations although she did not always understand why quite as well. Noticing details in her environment, visual memory and some aspects of spatial reasoning are also relatively strong for her. Auditory and visual processing skills are somewhat weak, consistent with a learning disability. Weak areas also include verbal comprehension, mathematical calculations in her head and a certain type of nonverbal reasoning involving matrices.

(T. at 244.)

In his recommendations, Dawson opined that "[p]robably the most important recommendation for the future for Jamie is to obtain VESID support services for a job after she

13

finishes school this year. She needs the guidance and support to help her be productive in the future. Otherwise she could be misled and become overwhelmed with the consequences. This examiner feels this is really important for Jamie." (T. at 245.)

### B. Medical Records

#### 1. Tammy S. Camidge, FNP

Plaintiff's medical records reveal that for a number of years she was treated by Family Nurse Practitioner Tammy Camidge ("FNP Camidge"), who worked in the medical practice of Howard T. Meny, M.D. (T. at 247-257, 311-322.) On August 11, 2006, FNP Camidge saw Plaintiff regarding her asthma. (T. at 257.) Plaintiff told Camidge she had been terminated from her job as a dishwasher at Turning Stone because she called in sick too often. *Id*. Plaintiff indicated that she had a lot of asthma attacks while working at Turning Stone, where smoking was allowed, and had one on Memorial Day that was bad enough that she had to leave. *Id.* Plaintiff was trying to obtain assistance from the Department of Social Services ("DSS") and asked FNP Camidge if she could get a written statement from her indicating that there was something at Turning Stone that triggered her asthma. *Id.* FNP Camidge agreed to write a letter to DSS. *Id*.

On October 16, 2009, Plaintiff saw FNP Camidge and told her that she felt that she had been under a lot of stress lately and wanted to go back on her antidepressant. (T. at 258.) FNP Camidge started Plaintiff back on Zoloft 50 mg. a day. *Id*. Plaintiff saw FNP Camidge again on November 20, 2009, for a recheck on the Zoloft. (T. at 255.) Plaintiff stated that she was doing better. *Id*. Plaintiff's physical exam showed that her lungs were clear and equal, and she had anxiety. *Id.* Plaintiff was diagnosed with depression and tachycardia probably related to her

anxiety.  (T. at 256.)

On January 22, 2010, Plaintiff saw FNP Camidge for a recheck on her depression.  (T. at 253.)  Plaintiff stated that her depression was well-controlled.  *Id.*  Plaintiff's respiratory exam revealed normal respiratory effort with no stridor.  *Id*.

Plaintiff saw FNP Camidge again on March 29, 2010, for a pre-operative exam in connection with upcoming laproscopic surgery in her knee.  (T. at 249.)   Plaintiff again indicated that her depression was well controlled.  *Id.*  Plaintiff reported slight asthma well controlled with her inhaler (Ventolin HFA 90 mcg/Acutation Aerosol Inhaler).  *Id.*  Upon examination, Plaintiff's lung sounds were clear and equal with normal respiratory effort.  (T. at 250.)

Plaintiff had a six month checkup with FNP Camidge on July 23, 2010.  (T. at 247.)  Included among her current medications were Zoloft 50 mg. a day, Alprazolam 0.5 mg. for anxiety, and an asthma inhaler.  *Id.*  Plaintiff stated that her depression was well-controlled, and her respiratory exam revealed normal respiratory effect with no stridor.  *Id.*

On January 24, 2012, Plaintiff saw FNP Camidge for depression screening and medication refills.  (T. at 311.)   Her active problems were listed as anxiety, asthma, depression, and hypothyroidism.  *Id.*  Plaintiff's depression was described as stable and her mood, affect, and cognitive functioning as normal.  (T. at 312.)   Her pulmonary exam revealed no pulmonary symptoms, and her lungs were clear to ausculation.  Plaintiff's patient visit note indicates that she was at that point taking Zoloft 100 mg. once a day and still had her asthma inhaler.  (T. at 311.)  Plaintiff was assessed with asthma, hypothyroidism, and anxiety disorder.  (T. at 313.)

Plaintiff saw FNP Camidge for a depression screening on August 7, 2013.  (T. at 314.)  The chief reason for the visit was to check up on Plaintiff's medications.  *Id.*  Plaintiff's

depression was described as stable, she had no pulmonary symptoms, her lungs were clear to auscultation, and her cognitive function was normal. (T. 314-15.) Plaintiff's mood was normal, and her thought processes and content revealed no impairment. (T. at 316.)

2. February 13, 2013, Emergency Room Visit

On February 13, 2013, Plaintiff presented at the emergency room at the Lewis County General Hospital with shortness of breath. (T. at 353.) Plaintiff stated that she had an asthma attack earlier that evening, and she complained of shortness of breath and palpitations. *Id*. Plaintiff was reported to have passed out for approximately a minute at home during a nebulizer treatment. *Id*. Plaintiff had also been given a nebulizer treatment by the EMS, and her breathing was a little better. *Id.*

Plaintiff's lungs were clear to auscultation bilaterally with normal symmetrical airflow. *Id*. She remained stable in the emergency room. The physician diagnosed shortness of breath and weakness. (T. at 354.) The physician's emergency room notes state that "[s]he may have had an asthma flareup which started this. The lungs are clear in the ER. I see no evidence of asthma exacerbation. I suspect that the real problem was an asthma flare up or another trigger which causes an anxiety response." (T. at 353.)

**C.  FNP Camidge Medical Source Statement**

FNP Camidge completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on Plaintiff on October 18, 2012. (T. at 323-28.) FNP Camidge found that Plaintiff could lift and carry up to 50 pounds continuously and 51-100 pounds frequently; could sit, stand, and walk for eight hours in an eight-hour workday; and had no limitations in the use of her hands and feet, or postural activities. (T. at 326.) FNP Camidge also found that Plaintiff

16

could tolerate continuous exposure to dust, odors, fumes, and pulmonary irritants. (T. at 327.)

FNP Camidge found that Plaintiff could perform activities such as shopping, using standard public transportation, preparation of a simple meal, care for her personal hygiene, and that she could sort, handle, or use paper/files. (T. at 328.) In response to a question regarding whether there were other work-related activities affected by any impairments, how the activities were affected, and the medical findings supporting the assessment, FNP Camidge wrote "[s]he has emotional problems with anxiety, depression, PTSD, and is mildly learning disabled." *Id.*

### D. Neurological Assessment and Treatment Notes of Toby K. Davis, Ph.D., MBA, CASAC

According to his notes, Clinical Psychologist Toby K. Davis, Ph.D. ("Dr. Davis") began treating Plaintiff on February 2, 2011, and was still seeing her as of July 8, 2013. (T. at 363-64.) On February 12 and February 24, 2011, Dr. Davis conducted a neuropsychological assessment of Plaintiff and issued his report on February 25, 2011. (T. at 270-77.)

#### 1. Dr. Davis' February 25, 2011, Report

Plaintiff's psychiatric history, as reported in Dr. Davis' February 25, 2011, report, included treatment for depression since childhood, an anxiety disorder, and possible PTSD. (T. at 271.) The report indicates that Plaintiff was taking Zoloft. *Id.*

Dr. Davis noted in his written impressions of Plaintiff, who was accompanied by her mother, that she made good eye contact but showed evidence of shyness and reservation. (T. at 272.) Dr. Davis found Plaintiff to be a fair historian, who relied upon her mother to amplify information. *Id.* Plaintiff reported a work history that reflected absenteeism with medical and social-emotional overtones. *Id.* Plaintiff indicated an interest in resuming work at Fort Drum or

the store where she had been a greeter. *Id.*

As a part of his neuropsychological assessment of Plaintiff, Dr. Davis reviewed her medical and mental health records; conducted a clinical interview with her; conducted a collateral interview with her mother; and administered tests including Neuropsychological Assessment Battery ("NAB"), Scales of Independent Behavior-Revised ("SIB-R"), and Personality Assessment Inventory ("PAI"). (T. at 270.) According to Dr. Davis, Plaintiff performed all tasks to the best of her ability. (T. at 272.)

a.    <u>NAB</u>

The NAB administered to Plaintiff covered the domains of Attention, Language, Memory, Spatial, and Executive functions. (T. at 272.) Plaintiff's score on the Attention Module suggested a moderate to severe impairment. *Id.* Specifically, Plaintiff expressed reduced auditory attentional capacity, reduced working memory for orally presented information, and compromised visuospatial working memory and visual scanning. *Id.* Plaintiff displayed difficulties in psychomotor speed, concentration, sustained attention, focused or selective attention, and information processing speed. *Id.*

In the Language Module, Plaintiff's score revealed diminished speech output or fluency, compromised auditory comprehension, compromised word-finding ability or possibly dysnomia or anomia, and limited simple calculation performance. *Id.* Plaintiff displayed a relative strength with her memory in the Memory Module, although her performance was still below average when compared to her peers. *Id.* Plaintiff's score on the Spatial Module suggested a mild impairment. *Id.* Her score on the Executive Functions Module suggested a moderate impairment when compared to her peers. (T. at 273.) Plaintiff was found to have difficulties with planning

18

and foresight and indicated poor self-monitoring and perseverative tendencies. *Id*.

b.     <u>Adaptive Functioning</u>

Dr. Davis' assessment of Plaintiff's adaptive functioning was based upon her mother's completion of the SIB-R, which measures domains associated with living in the community and maintaining independence. (T. at 273.) Broad Independence is described in the report as a measure of overall adaptive behavior based on an average of four different areas of adaptive functioning: motor skills, social interaction and communication skills, personal living skills, and community living skills. *Id*. Plaintiff's functional independence was found by Dr. Davis to be within the low range of scores obtained by others at her age level. *Id*.

Social Interaction and Communications Skills measured Plaintiff's interactions with others in various social settings as well as her understanding and communication of information through signs, oral expressions, and written symbols. *Id*. Plaintiff's social interaction and communication skills were limited, with her performance comparable to that of an average individual at 12 years 2 months. *Id*. When presented with age-level tasks, Plaintiff's language comprehension skills were limited to very limited, and age-level tasks involving understanding signals, signs, or speech and deriving information from spoken and written language would be difficult to very difficult for her. *Id*. Dr. Davis concluded that, as a result, age-level tasks involving talking and other forms of expression would be very difficult for her. (T. at 274.)

Personal Living Skills were described as including adaptive behaviors related to eating and preparing meals, taking care of personal hygiene and appearance, and maintaining an orderly home environment. *Id*. Dr. Davis concluded that age-level dressing would be difficult to extremely difficult for Plaintiff; tasks involving basic grooming and health maintenance tasks

would be very difficult, as would age-level tasks involving home maintenance.  *Id.*

Community Living Skills measure the skills needed to successfully use community resources, perform in an employment setting, and assume other social and economic requirements encountered in community settings, including tasks involving time and punctuality, money and value, work skills, and home and community orientation.  (T. at 274.)  Dr. Davis reported that Plaintiff's lowest adaptive behavior domain scores included her community living skills, with her performance comparable to an average individual of 13 years 3 months.  *Id.*  Those tasks that Dr. Davis concluded would be very difficult for Plaintiff included those related to determining the value of items and using money (very difficult to extremely difficult), age-level work habits and prevocational skills (very difficult), and age-level tasks related to getting around the home, neighborhood, or traveling in the community (very difficult).  *Id.*

c.    Psychological

Dr. Davis explained in his Report that Plaintiff was administered the PAI in order to ascertain her psychological presentation.  (T. at 274.)  According to Dr. Davis, the PAI provides a number of validity indices designed to provide an assessment of factors that could distort the results of testing, including such things as failure to complete test items properly, carelessness, reading difficulties, confusion, exaggeration, malingering, or defensiveness.  (T. at 274-75.)  The number of Plaintiff's uncompleted items was found to be within acceptable limits.  (T. at 275.)  The test results also showed that Plaintiff attended appropriately to item content and responded in consistent fashion to similar items.  *Id.*

The PAI also assessed the degree to which styles may have affected or distorted the report of symptomatology on the inventory.  *Id.*  Certain of the indicators fell outside of the normal

range suggesting that Plaintiff may not have answered in a forthright manner. *Id.* With respect to negative impression management, there was no evidence suggesting that Plaintiff was generally motivated to portray herself as relatively free of common shortcomings or minor faults. (T. at 275.) With respect to negative impression management, there is no evidence to suggest that Plaintiff was motivated to portray herself in a more negative or pathological light than the clinical picture would warrant. *Id.*

Plaintiff's PAI clinical profile was marked by a significant elevation on the ANX scale, indicating that the content tapped by the scale might reflect a particular area of difficulty for Plaintiff, who indicated to Dr. Davis that she was experiencing a discomforting level of anxiety and tension. *Id.* Dr. Davis found that Plaintiff was likely to be plagued with worry that her ability to concentrate and attend is compromised, and she feels a great deal of tension, has difficulty relaxing, and likely experiences fatigue as a result of high perceived stress. *Id.* Dr. Davis opined that Plaintiff's traumatic stress was likely related to the childhood victimization discussed in his evaluation. *Id.* He concluded that Plaintiff would likely feel overwhelmed under relatively minor pressure, and that her responses to the PAI indicated that she was experiencing notable turmoil and stress in a number of major life areas. (T. at 276.)

d.    Recommendations

Dr. Davis recommended that Plaintiff receive continued medication therapy in conjunction with psychotherapy to deal with longstanding depression and anxiety, and that she engage in brief work periods, a few hours or less, to minimize fatigue. (T. at 277.) Dr. Davis also recommended

a work environment that capitalizes on her strengths while

21

ameliorating her deficits. She appears to possess affable and positive social traits and these may enable Ms. Leonard to perform well in an environment that has a structure that promotes collective effort. Structures that rely on autonomous effort, though may be appealing and desired, may be stressful to Ms. Leonard, contributing to lower work performance and absences. Again, briefer periods under these conditions may optimize Ms. Leonard's performance.

(T. at 277.)

### 2. Dr. Davis' Office Notes

Dr. Davis' office notes reveal that he had a total of twelve sessions with Plaintiff from February 2, 2011, through July 8, 2013. (T. at 363-64.) The notes indicate that the sessions focused largely on dealing with her trauma history, anxiety, depression, fears, family issues, fatigue issues, and going back to work. *Id*. The notes dealing with employment issues suggest a desire on Plaintiff's part to go to work mixed with anxiety about doing so. *Id*. Plaintiff wanted Dr. Davis to endorse her desire to go back to work. (T. at 363.) According to Dr. Davis, when they looked at the scores Plaintiff had achieved on testing, she insisted she had "'[f]aked doing bad' in order for secondary gain." *Id*. In June of 2012, Plaintiff vacillated between wanting to work and wanting to seek benefits. (T. at 363.) However, on July 8, 2013, Plaintiff informed Dr. Davis that she had decided not to go back to work for a while. (T. at 363.)

In January of 2013, Plaintiff reported doing well and in March of 2013 denied depression or anxiety. (T. at 364.) In July of 2013, Plaintiff reported being generally happy and having no PTSD, depression, or anxiety symptoms. *Id*.

### E. Consultative Examination with Dennis M. Noia, Ph.D.

Dr. Noia conducted a consultative psychiatric examination of Plaintiff on May 17, 2011.

22

(T. at 283.)  Plaintiff was brought to the examination by her then husband's grandmother with whom they lived.  (T. at 283.)  Plaintiff informed Dr. Noia that she had last worked as a store greeter for a period of seven months ending in February of 2011.  *Id*.  She told Dr. Noia that she had been fired because of difficulty with asthma.  *Id*.  According to Dr. Noia, Plaintiff stated that she was able to work at the present time but was unable to find a job.  *Id*.

Plaintiff informed Dr. Noia that she had no history of psychiatric hospitalization, that she had been in treatment with Dr. Davis since March of 2011, and that she had no prior outpatient treatment.  *Id*.  Plaintiff admitted to symptoms of depression and anxiety, including dysphoric moods, loss of usual interests, increased irritability, fatigue and loss of energy, problems with memory, problems with concentration, and restlessness.  (T. at 284.)  She indicated that while treatment had improved her symptoms, they still occurred frequently.  *Id*.

Dr. Noia reported that on examination, Plaintiff's demeanor and responsiveness to questions were cooperative, and that her manner of relating, social skills, and overall presentation were moderately adequate.  *Id*.  Plaintiff's dress was appropriate, her grooming and hygiene good, and her gait, posture, and motor behavior were normal.  *Id*.  Eye contact was appropriate.  *Id*.  Plaintiff's speech was fluent and her expressive and receptive language moderately adequate.  (T. at 484-85.)  Her mood was calm, and she appeared relaxed and comfortable.  (T. at 285.)

Dr. Noia concluded that Plaintiff's attention and concentration were intact.  *Id*.  He noted that "[s]he was able to do counting, but had difficulty with simple calculations and serial 3s because of poor arithmetic skills."  *Id*.  Dr. Noia found Plaintiff's recent and remote memory skills to be intact based upon her ability to "recall three objects immediately and after five minutes and restate four digits forward and three digits backwards.  *Id*.

Dr. Noia found Plaintiff's cognitive functioning to be in the borderline range and her general fund of information to be somewhat limited. (T. at 285.) Plaintiff reported to Dr. Noia that she was able to dress, bathe, and groom herself on a regular basis; could cook and prepare food; and do general cleaning and laundry. *Id*. Plaintiff could drive and take public transportation but did not manage money. *Id*. Plaintiff reported getting along well with friends and family and spending her days doing chores, socializing, quilting, watching television, and listening to the radio. *Id*.

Based upon his examination Dr. Noia included the following medical source statement in his evaluation of Plaintiff:

> Vocationally the claimant appears to be capable of understanding and following simple instructions and directions. She appears to be capable of performing simple and some complex tasks with supervision and independently. She appears to be capable of maintaining attention and concentration for tasks. She can regularly attend to a routine and maintain a schedule. She appears to be capable of learning new tasks. She appears to be capable of making appropriate decisions. She appears to be able to relate to and interact moderately well with others. She appears to be having some difficulty dealing with stress.

(T. at 285-86.)

Dr. Noia diagnosed Plaintiff with depressive disorder NOS, anxiety disorder NOS, borderline intellectual functioning, and asthma. (T. at 286.) He recommended that Plaintiff continue her current treatment and opined that her prognosis was fair. *Id.*

### F.    Assessment of State Agency Medical Consultant Tammy Inman-Dundon

Non-examining State Agency consultant Tammy Inman-Dundon ("Inman-Dundon") assessed Plaintiff as having severe anxiety disorder, borderline intellectual functioning, and

affective disorder.  (T. at 76.)  Inman-Dundon found that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (T. at 76.).  She found that Plaintiff's medical examination reports indicated that Plaintiff was able to perform unskilled work on a sustained basis.  (T. at 80.)

### G.    Plaintiff's Hearing Testimony

At the time of the hearing, Plaintiff was twenty-seven years old and living with her parents.  (T. at 52.)  Plaintiff testified that she helped out her parents by doing laundry, dishes, housework, and running errands for them.  (T. 60.)  Plaintiff did grocery shopping for her parents once in a while.  (T. at 62.)  Plaintiff's mother would give her a written list and go over it with her verbally before she left for the store to make sure she had it in her mind.  *Id*.  If Plaintiff had a problem while shopping, she would call her mother.  *Id*.  Plaintiff testified that she drove the car by herself and had no problem getting gas at the gas station or making change to pay for it.  (T. at 63.)  Plaintiff also occupied her time by playing games and chatting with friends and family on the computer, knitting, going camping with her parents, and sometimes going out to visit friends and family.  (T. at 60-61.)

Plaintiff testified that she had worked as a greeter at a store approximately thirty hours a week before being terminated for health reasons.  (T. at 54.)  According to Plaintiff, she was sick a lot and has asthma where she passes out and was having a bad time with asthma at the time.  (T. at 53-54.)  Plaintiff looked for a new job – pretty much anything – with no success and collected unemployment benefits for a period of time.  (T. at 55.)

Prior to working as a store greeter, Plaintiff worked as a prep cook at a college and at a

25

race track.  (T. at 56.)  She could not recall if she worked part or full time.  *Id*.  The college job ended because it was seasonal.  (T. at 56.)  For a month and a half, Plaintiff worked in housekeeping at Turning Stone.  *Id*.  She did not recall if she had worked full or part time.  *Id*.  Plaintiff testified that she left Turning Stone because it was too long a drive, and she wanted a job closer to home.  *Id*.  When asked by her attorney, Plaintiff acknowledged that she was having problems at Turning Stone because her employer did not think she was cleaning rooms quickly enough.  (T. at 61.)

Plaintiff testified that she did not have problems getting along with people.  (T. at 67-68.) However, she did not think she would be able to work full time because of her health and anxiety.  (T. at 57.)  She identified her health issues as a learning disability which had interfered with jobs because she did not understand instructions and had difficulty figuring out change; depression; anxiety; and asthma.  *Id*.

According to Plaintiff, being nervous made her anxiety attacks worse, and that her anxiety was triggered when she was in a big group of people she did not know, when she did not understand her work, or there was a time limit on her work.  (T. at 60.)  Plaintiff testified that when she becomes anxious she acts out and described a work incident where she cursed and yelled at her boss in front of customers after her boss had yelled at her to get off the phone and back to her work station when she was trying to deal with having locked her keys in the car.  (T. at 69-70.)

When asked what triggered her asthma attacks, Plaintiff testified that she was allergic to her own colds.  *Id*.  According to Plaintiff she had more asthma flareups in winter and spring and used her inhaler when she had trouble breathing.  (T. at 57-58.)  Although Plaintiff initially

testified that there were no activities that made her reach for her inhaler, when asked by her attorney, Plaintiff indicated that exercise bothered her breathing a little.  (T. at 58, 65.) According to Plaintiff, she only used her inhaler once in a while when she was having trouble breathing.  (T. at 65.)

Plaintiff testified that she was taking Zoloft for her anxiety and seeing a counselor every month for her anxiety and depression.  (T. at 60.)  Plaintiff also testified that while she had worked with a VESID job coach in the past, she had not spoken to them lately.  (T. at 68.)

## VI.    ANALYSIS

### A.    Severity Determination as to Plaintiff's Asthma

At the second step of the evaluation, the medical severity of a claimant's impairments is considered.  20 C.F.R. § 404.1520(a)(4)(ii).  A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.* at §§ 404.1520(c), 404.1521.  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  *Id.* at § 404.1521(b).  These include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  *Id.*; *see also Ianni v. Barnhart*, 403 F. Supp. 2d 239 (W.D.N.Y. 2005); *Camacho v. Apfel*, Civ. No. 97-6151 (JG), 1998 WL 813409, at *6, 1998 U.S. Dist. LEXIS 23866, at *17 (E.D.N.Y. July 22, 1998).

The claimant-plaintiff bears the burden of presenting evidence to establish severity.  20 C.F.R. § 404.1512(c).  The claimant-plaintiff must demonstrate "that the impairment has caused

functional limitations that precluded [her or] him from engaging in any substantial gainful activity for one year or more." *Perez v. Astrue*, 907 F. Supp. 2d 266, 272 (N.D.N.Y. 2012) (citing *Rivera v. Harris*, 623 F.2d 212, 215 (2d Cir. 1980)). A finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work. *Id.* at 271; SSR 85-28, 1985 WL 56858, at * 2 (1985).

Plaintiff maintains that the ALJ failed to properly assess her asthma as a severe impairment. (Dkt. No. 13 at 6-7.) Defendant asserts that Plaintiff did not meet her burden of showing that her asthma caused functional limitations that significantly limited or precluded her from engaging in basic work activities. (Dkt. No. 14 at 7-11.) The Court agrees with Defendant and finds that there is substantial evidence supporting the ALJ's step two determination that Plaintiff's asthma is not a severe impairment.

In support of her claim that her asthma constitutes a severe impairment, Plaintiff states that she has been treated for asthma regularly since childhood; she was terminated from one of her jobs for frequent absences due to her medical conditions, including one instance in 2006 where she was forced to leave work early due to an asthma attack from work place smoke; that FNP Camidge noted on January 24, 2012, that asthma was one of Plaintiff's "active problems"; and that on February 13, 2013, she suffered an asthma attack that resulted in shortness of breath and palpitations and passed out during a nebulizer treatment. (Dkt. No. 13 at 7-8.)

The ALJ, in determining that Plaintiff's asthma was not a severe impairment, relied in part on FNP Tammy Camidge's progress notes on Plaintiff, which indicated that Plaintiff

described herself as having slight asthma well controlled with an inhaler.[6] (T. at 33, 249.) The ALJ also noted that Plaintiff's physical examinations with FNP Camidge regularly showed that her lungs were clear to auscultation. (T. at 33, 250, 255, 257-58.) The ALJ acknowledged that Plaintiff had sought emergent care for shortness of breath in February 2013, but noted that Plaintiff's medical records indicated that there was no evidence of asthma exacerbation, her lungs were clear, and the medical examiner had opined that her shortness of breath might have resulted from an anxiety response. (T. at 33, 353.) In addition, the ALJ noted that Plaintiff's mother had reported that Plaintiff's asthma was not disabling, and progress notes from January 2012 indicated that Plaintiff had no physical disability. (T. at 33, 75, 312.)

The Court also notes that when Plaintiff was treated at the Lewis County General Hospital for an unrelated issue on December 31, 2010, her lungs were clear, and she was not in any respiratory distress. (T. at 33, 331.) In addition, in the medical source statement she completed on Plaintiff, FNP Camidge found that Plaintiff could tolerate continuous exposure to dust, odors, fumes, and pulmonary irritants. (T. at 327.)

Even if the ALJ erred in failing to find Plaintiff's asthma to be a severe impairment, the error would be harmless because the ALJ found other severe impairments, and in her sequential analysis, she addressed Plaintiff's asthma along with the severe impairments. In assessing Plaintiff's RFC, the ALJ expressly relied upon FNP Camidge's medical source statement in which she opined that Plaintiff could tolerate exposure to dust, odor, fumes, and other pulmonary irritants on a continual basis. (T. at 323-28.) *See Zenzel v. Astrue*, 993 F. Supp. 2d 146, 153-54

---

[6] Nurse practitioners are "other sources" whose opinions may be considered with respect to the severity of a claimant's impairment and ability to work, but cannot establish a medical impairment. *See* 20 C.F.R. § 404.1513(d).

(N.D.N.Y. 2012) (harmless error in failing to exclude an impairment from the list of severe impairments where ALJ found other severe impairments and considered the non-severe impairment and its effect on ability to work during the balance of the sequential evaluation).

###### B.  Application of the Special Psychiatric Review Technique

The Second Circuit has held that in addition to the typical five-step analysis outlined in 20 C.F.R. § 404.1520a, the ALJ must apply a "special technique" at the second and third steps to evaluate alleged mental impairments. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If a finding that a claimant has a medically determinable mental impairment is made at step two (20 C.F.R. § 404.1520a(b)(1)), at step 3 the ALJ must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. § 404.1520a(c)(3).  The degree of limitation is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." § 404.1520a(c)(4).  The ALJ's written decision "must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section." § 404.1520a(e)(2).

Under the regulations, if the degree in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the ALJ will conclude that the plaintiff-claimant's mental impairment is not severe and will deny benefits. § 404.1520a(d)(1).  If the plaintiff-claimant's mental impairment or combination of mental impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the ALJ must "first compare the relevant medical findings [as well as] the functional

limitation rating to the criteria of listed mental disorders." *Kohler*, 546 F.3d at 266 (citing 20

C.F.R. § 404.1520a(d)(2)).  If the impairment or combined impairments meets or is equivalent in

severity to any listed mental disorder, the plaintiff-claimant will be found disabled.  *Id*.  If not,

the ALJ will then assess the claimant's RFC.[7]  § 404.1520a(d)(3).

In order to properly apply the "special technique" required for a disability determination

of a claimant asserting mental impairments, the ALJ's decision must show "the significant

history, including examination and laboratory findings, and the functional limitations that were

considered in reaching a conclusion about the severity of the mental impairment(s)."  20 C.F.R.

§ 404.1520a(e)(4).  Although the ALJ enumerated and determined the severity of each of the four

functional areas listed in § 404.1520a(e)(4), she did not provide the requisite "specific findings"

required to justify her ratings as to the degree of limitation in those areas.  (T. at 32.)  *See Comins*

*v. Astrue*, 374 F. App'x 147, 150 (2d Cir. 2010) (finding that the ALJ properly followed the

special technique when the decision "specifically expounded upon each of the four functional

areas of the special technique" and "[b]olstered by evaluations from a variety of medical

personnel . . . he carefully laid out the limitations [claimant] would be expected to have in each

area.");  *see also Buford v. Comm'r of Social Sec.*, No. 12-CV-5751 (KAM), 2015 WL 8042210,

at *17-17, 2014 U.S. Dist. LEXIS 162156, at *51 (E.D.N.Y. Dec. 3, 2015) (remanding for ALJ's

failure to adequately explain his determination on functional ratings where when evaluating

---

[7]  The special technique described in 20 C.F.R. § 404.1520a(b)(1) is not an RFC
assessment.  *See* SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996) ("The adjudicator
must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are
not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3
of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the
sequential evaluation process requires a more detailed assessment by itemizing various functions
contained in the four broad categories").

plaintiff's restrictions on activities of daily living and difficulties in concentration, persistence, and pace, ALJ made brief reference to mental health status evaluation by a consultative psychiatrist who saw plaintiff on one occasion); *Fait v. Astrue*, No. 10-CV-5407 (NGG), 2012 WL 2449939, at *6, 2012 U.S. Dist. LEXIS 89350, at *17 (E.D.N.Y. June 27, 2012) (finding that ALJ's failure to justify his findings regarding the severity of the claimant's disability was improper application of the special technique and legal error that was cause for remand).

The ALJ rated Plaintiff's functional limitations as mild for activities of daily living and difficulties in social functioning, and at most moderate in maintaining concentration, persistence or pace. (T. at 32.) She found no episodes of decompensation. *Id*.

The sole support for her finding that Plaintiff had a mild functional limitation on activities of daily living was a brief reference to State consultant Dr. Noia's May 17, 2011, psychiatric evaluation (mental health assessment), in which Plaintiff was reported as having stated that she could on a regular basis dress bathe and groom herself; cook and prepare food and do laundry and shopping; and drive and take public transportation.[8] (T. at 32, 285.) The ALJ made no reference to Plaintiff's disclosure to Dr. Noia that she did not manage money. *Id*.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) defines activities of daily living to include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Plaintiff's history, as disclosed in Dr. Noia's

---

[8] The record indicates that Plaintiff was seen by Dr. Noia on one occasion, and suggests that his somewhat cursory evaluation was based solely upon his interview with Plaintiff given that the psychiatric examination report gives no indication that Dr. Noia reviewed any of Plaintiff's school or medical records in connection with his examination. (T. at 283-86.)

evaluation, reveals that she cannot manage money and, therefore, may well be unable to pay bills. (T. at 285.) Furthermore, Plaintiff testified that she lives at home with her parents, and there is no evidence in the record suggesting that Plaintiff has ever maintained a residence on her own.[9]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) describes social functioning as referring to the "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. . . . [including] the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." The ALJ's finding that Plaintiff had only mild difficulties in social functioning was based solely upon Dr. Noia's psychiatric evaluation in which he described Plaintiff as cooperative with adequate social skills and noted that Plaintiff had reported that she got along well with friends and family. *Id*.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3) refers to concentration, persistence, and pace as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." In rating Plaintiff's functional limitation in concentration, persistence, and pace, the ALJ made brief note of Dr. Davis' finding that Plaintiff's attention domain was moderately to severely impaired before determining that Plaintiff had a moderate limitation based upon Dr. Noia's indication in his psychiatric evaluation that, based upon Plaintiff's ability to do counting and her object recall during her examination, her attention and concentration were intact, and her recent and remote memory skills were intact. (T. at 32-33, 285.)

---

[9] The record reflects that Plaintiff was married for a period of time but was divorced some time ago. (T. at 144, 311-12.) She and her husband lived with his grandmother. (T. at 283.) Dr. Davis' office notes indicate that Plaintiff was engaged and living with her fiancée as of April of 2013. (T. at 364.)

The ALJ must consider the entire record in accordance with her duty under 20 C.F.R. § 404.1520(3) and may not simply pick and choose from the transcript only such evidence as supports her or his determination, without affording consideration to evidence supporting a plaintiff-claimant's claims. *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004). It is grounds for remand for the ALJ to ignore parts of the record that are probative of a plaintiff-claimant's claim. *Id*.

Dr. Davis' neuropsychological assessment of Plaintiff includes an assessment of Plaintiff's functional limitations with regard to activities of daily living, social function, and attentiveness relevant to concentration, persistence, or pace. (T. at 272-74.) In addition to finding Plaintiff's attention domain to be moderately impaired, he opined that Plaintiff had a number of significant difficulties in the areas of personal living skills, social functioning, and community living skills which should have been identified and discussed by the ALJ in her application of the special technique. *See* 20 C.F.R. § 404.1520a(e)(4). The requirement that she do so would be present regardless of whether Dr. Davis were found to be Plaintiff's treating physician. *Id*.

In her Decision, the ALJ has identified Dr. Davis as Plaintiff's treating physician for Plaintiff's depressive disorder and PTSD. (T. at 32.) "If . . . a treating source's opinion . . . is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence . . . [it] will [be] give[n] controlling weight." 20 C.F.R. § 404.1527(c)(2). Generally, the longer a treating physician has treated the claimant and the more times the claimant has been seen by the treating source, the more weight the Commissioner will give to the physician's medical opinions. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir.

2008) (citing 20 C.F.R. § 404.1527(c)(2)(I)).

An ALJ who refuses to give "controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted). This analysis must be conducted to determine what weight to afford any medical opinion. 20 C.F.R. § 404.1527(c). This is necessary because the ALJ is required to evaluate every medical opinion received. *Id.*; *see also Zabala v. Astrue*, 595 F.3d 402 (2d Cir. 2010) (finding that the ALJ failed to satisfy the treating physician rule when he discounted a report because it was incomplete and unsigned). These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. *Id.* at § 404.1527(c)(2)-(6).

Generally, the opinion of the treating physician will not be afforded controlling weight when the treating physician issued opinions that were not consistent with those of other medical experts and the opinions are contradicted by other substantial evidence in the record. *Halloran*, 362 F.3d at 32; 20 C.F.R. § 404.1527(c)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given."). Other findings, including the ultimate finding of whether the claimant is disabled, are reserved to the Commissioner. *Snell*, 177 F.3d at 133.

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). This is necessary to assist the court's review of the Commissioner's decision and it "let[s] claimants understand the disposition of their cases." *Halloran*, 362 F.3d at 33 (citing *Snell*, 177 F.3d at 134). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell*, 177 F.3d at 133; *Halloran*, 362 F.3d at 32-33.

The ALJ has neither conducted the required treating physician analysis to explain her failure to give controlling weight to Dr. Davis' neuropsychological assessment application of the special technique, nor explained why the treating physician rule does not apply in this case. The Court cannot conclude based on the record that the ALJ would have arrived at the same conclusions on Plaintiff's functional limitations had she conducted the treating physician rule analysis and allocated weight to Dr. Davis' opinions in accordance therewith. Therefore, because it is not clear that the application of the correct legal standard could lead to only one conclusion, the Court recommends remand to the Commissioner for further proceedings in accordance herewith. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

## C.    Listing 12.05(C)

Plaintiff claims that the ALJ erred in her determination that her intellectual dysfunction did not meet Listing 12.05(C). (Dkt. No. 13 at 12-16.)  As explained below, the Court finds that because the ALJ's determination suffers from the same legal error as her application of the special technique, remand is warranted for further consideration.

Listing 12.05 sets forth the conditions under which a person is intellectually disabled. To satisfy Listing 12.05, Plaintiff must make a threshold showing that she suffers from significantly

subaverage general intellectual functioning with deficits in adaptive functioning, initially

manifested prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; *see Talavera v. Astrue*,

697 F.3d 145, 152-53 (2d Cir. 2012). The severity in Listing 12.05 is met when the plaintiff-

claimant meets the criteria listed in 12.05(A), (B), (C), or (D). *Id.* For a plaintiff-claimant to

show that her or his impairment matches a listing, "it must meet *all* of the specified medical

criteria." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original). "An impairment

that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*

In order to meet the requirements of subsection (C), Plaintiff must have a valid verbal,

performance, or full-scale IQ of 60-70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function.[10] In addition, Plaintiff must show

deficits in adaptive functioning that arise from her cognitive limitations. *Lawler v. Astrue*, 512 F.

App'x 108, 110-12 (2d Cir 2013) (citing *Talavera*, 697 F.3d at 153).

The record evidence establishes that Plaintiff obtained a Verbal IQ score of 66 on the

WISC-III administered by the school psychologist in 1997 when Plaintiff was an eleven year old

fifth grade student. (T. at 234.) Plaintiff obtained a Verbal IQ score of 69 on the WAIS-III

administered by the school psychologist in 2003 when Plaintiff was in her senior year.[11] (T. at

---

[10] The Commissioner does not appear to dispute Plaintiff's argument that her depression, anxiety, and PTSD constitute impairments imposing additional and significant work-related limitation of function under 12.05(C). (Dkt. No. 14 at 12-16.) Inasmuch as the ALJ found all three constitute severe impairments, the Court does not question that Plaintiff satisfies that requirement. *See Bankey v. Apfel,* 997 F. Supp. 543, 546 (S.D.N.Y. 1998) (holding that the correct standard for determining whether an "additional" impairment imposes a "significant" work-related limitation under 12.05(C) is the severity test set forth at step 2).

[11] "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt.

292.)

While the ALJ acknowledged that Plaintiff had IQ scores that fell below 70, she

concluded that Plaintiff did not satisfy the requirements of 12.05(C) because the evidence did not

support the requisite deficits in adaptive functioning.[12]  (T. at 34.)  Specifically, the ALJ relied

upon Dawson's 1995 evaluation in which he found Plaintiff's adaptive behaviors to be

"borderline to normal suggesting that while she does have difficulties, she is adapting and

adjusting relatively well" (T. at 34, 232); Dunckel's 2000 psychological report on Plaintiff noting

that Plaintiff's adaptive skills had not been fully assessed because she was functioning

adequately in school social and home life (T. at 34, 240); Plaintiff's testimony that she had been

able to work at a variety of jobs (T. 34, 48-71); Plaintiff's ability to maintain her own activities

of  daily life (T. 34, 91); completion of high school[13] (T. at 34, 59); and ability to drive a car and

use public transportation.  (T. at 34, 285.)   The ALJ found such a broad range of daily activities

and the ability to engage in work activity for several years to be inconsistent with deficits in

adaptive functioning.  (T. at 35.)

"Adaptive function refers to an individual's ability to cope with the challenges of

---

P, App. 1, 12.00(D)(6)(c).

[12]  Plaintiff erroneously asserts that a showing of deficits in adaptive functioning is not
required to satisfy the criteria of Listing 12.05(C). (Dkt. No. 13 at 13-14.)  *See Talavera*, 697
F.3d at 152-53 (requiring threshold showing by Plaintiff of deficits in adaptive functioning,
initially manifested prior to age 22).

[13]  The Court notes that in *DeCarlo v. Astrue*, No. 8:06-CV-488 (LEK/VEB), 2009 WL
1707482, at *6, 2009 U.S. Dist. LEXIS 51212, at *18 (N.D.N.Y. June 17, 2009), the court noted
that other courts had found circumstantial evidence such as attending special education classes
sufficient to infer deficits in adaptive functioning prior to age 22.  Therefore, the ALJ's reliance
on Plaintiff's receipt of an IEP diploma as evidence that she does not have deficits in adaptive
functioning may be questionable.

ordinary everyday life."[14] *Talavera*, 697 F.3d at 153 (quoting *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (punctuation omitted). "The term 'adaptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her own age. Indicators of adaptive behavior include . . . educational and social achievements." *Lyons v. Colvin*, No. 7:13-CV-00614 (TJM), 2014 WL 4826789, at *10, 2014 U.S. Dist. LEXIS 137002, at *32 (N.D.N.Y. Sept. 29, 2014) (quoting POMS DI 24515.056D2). "[T]o qualify as mentally retarded under DSM-IV-TR, deficits in only two of the following adaptive functioning skill areas are required: communications, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Lyons*, 2014 WL 4826789, at *10. *See also Barton v. Astrue*, No. 3:08-CV-0810 (FJS/VEB), 2009 WL 5067526, at *8, 2009 U.S. Dist. LEXIS 117617, at *25 (N.D.N.Y. Dec. 16, 2009) ("Since none of the methods endorsed by the major professional organizations require deficits in all areas of adaptive functioning, the term 'deficits in adaptive functioning' must allow for adaptive functioning in some areas, as long as there are deficits present in other areas of functioning.")

There is no indication in her Decision that the ALJ gave any consideration to Dr. Davis' neuropsychological assessment of Plaintiff in deciding that Plaintiff did not have deficits in adaptive functioning, despite the fact that the assessment notes that Plaintiff was moderately to

---

[14] When considering adaptive functioning, the relevant difficulties are those arising from plaintiff-claimant's cognitive limitations rather than those arising from other ailments." *See Talavera*, 697 F.3d at 154 ("[W]hile the record indicates that Talavera suffers from some limitations in her ability to take care of her children and effectively manage a household, . . . these problems arise from her physical ailments, not her cognitive limitations.").

severely impaired in attention; severely impaired in language; below average in memory; and moderately impaired in executive function. (T. at 272-73.) Dr. Davis noted that Plaintiff had limited functional independence, in the 3rd percentile for her age group; limited social interaction and communication skills (the equivalent of a fifteen year old); and limited to very limited language skills. (T. at 273-74.) Dr. Davis opined that age-level language tasks would be "very difficult" for Plaintiff, and that her community living skills were the equivalent of a thirteen year old child. (T. at 274.)

Given the relevance of Dr. Davis' findings to the determination of the issue of whether Plaintiff has deficits in adaptive function under Listing 12.05(C), the Court recommends that the matter be remanded for the purpose of allowing the Commissioner to address the treating physician rule with respect to Dr. Davis and determine the proper weight to be given to his assessment of Plaintiff's adaptive functioning.[15]

## VII.  CONCLUSION

For the reasons discussed above the Court recommends that the matter be remanded to

---

[15]  In her RFC analysis, the ALJ calls Dr. Davis' recommendations with regard to Plaintiff into question because of an entry in his treatment notes indicating that Plaintiff had informed him that she had "'faked doing bad' in order for secondary gain." (T. at 37. 363.) The entry, dated April 21, 2011, states in relevant part "Engaged in CBT to address challenges in reality testing. She desires to go to work and wants an endorsement. We looked at the scores she achieved on testing. She insists she 'faked doing bad' in order for secondary gain." There is nothing in the treatment notes by way of follow up on Plaintiff's comment and the actual significance is left to speculation since the notes were received by the ALJ after the hearing. (T. at 362.) In his assessment, Dr. Davis opined that Plaintiff performed all tasks to the best of her ability. (T. at 272.) However, according to Dr. Davis, Plaintiff's results on the PAI were in a range suggesting that she may not have answered in a forthright manner. (T. at 275.) Because Dr. Davis' assessment of Plaintiff's personal and community living skills was based upon Plaintiff's mother's completion of the SIB-R, whether or not Plaintiff "faked doing bad" would have no relevance with regard to those skills. (T. at 273.)

the Commissioner for further proceedings in accordance herein regarding the ALJ's application of the special technique under 20 C.F.R. § 404.1520a and whether Plaintiff has satisfied the requirements of Listing 12.05(C). Because this recommendation implicates a step 3 determination, the Court refrains from addressing Plaintiff's challenges to the ALJ's determination at subsequent steps in the sequential evaluation.

**WHEREFORE**, it is hereby

**RECOMMENDED** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[16] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: March 2, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[16] Sentence four reads "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g) (2005).